UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 1:14-cr-10344-FDS |
| v. | ) | April 8, 2015 |
| JOHN FAHERTY, | ) | |
| Defendant | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant, John Faherty, hereby submits this memorandum in connection with his sentencing scheduled for April 16, 2015.

I. PROCEDURAL BACKGROUND

This memorandum addresses certain factors relative to the sentencing decision including the application of the sentencing guidelines. The guideline range is Zone C, level 13, 12 to 18 months confinement, which provides that at least one-half of the period of confinement be incarceration. The Government has stipulated in the Plea Agreement that it recommends incarceration at the low end of the range, 12 months. The defendant requests, for the reasons stated below, that a non-Guideline sentence be imposed which would still substantially restrict the defendant's freedom without the consequent likely loss of his career. The defendant asks the Court to impose a sentence which would provide for an extended period of home confinement with access outside the home only to work and to continue the community and charitable acts he has been

performing with his wife to improve their community. For the reasons stated below, such a sentence meets the purposes of 18 U.S.C. section 3553.

## II.   FACTUAL BACKGROUND

Mr. Faherty, age 56, has pled guilty to one count of filing a false return in violation of 26 U.S.C. § 7206.

### A.  Background and Work History

Mr. Faherty graduated from Milford High School and attended Fitchburg State College in 1982.  John left school before graduating and became an assistant manager at Burger King until 1984 when he worked as a salesman for Package Steel Building.  From 1987-1990 he sold plastic parts for IPL Industries and then left to work as a salesman for Rosenfeld Concrete.  From 1993-1994 he was a salesman for a roofing company.  In 1994 he worked for Barker Steel Co. where he began as a salesman, rising to inside sales manager.  After 18 years with Barker, the company was sold. The buyer signaled its intention to layoff Mr. Faherty's sales group comprised of 16 employees. However in June 2012, a month after the sale, his group moved en masse to HD Supply White Cap Construction.  His group worked together at the new company's offices in Stoughton Mass. with John as manager until December 1, 2014 when the company opened a new location in South Boston and made John its branch operation manager.   His entire professional career has been in sales.

Mr. Faherty's wife, Michelle, is a high school graduate with one year of college at Cape Cod Community College.  She left school when her father died of bone cancer in 1985.  Her career has also been largely in sales.  In 2005, she formed MRF Associates

and became self-employed as an independent manufacturer sales representative for several companies, usually between 6 and 10 organizations.

Mr. Faherty offered to take care of MRF Associates' books and deposits in order to reduce expenses. However, Mr. Faherty had no experience maintaining books in a professional manner. He worked sixty-hour weeks in another industry, often away from home, such that maintenance of Michelle's finances was a low priority. Mr. Faherty had no consistent bookkeeping process; he relied on voicemail banking to track accounts. Documents and payment storage were, rather than an organized system, the kitchen counter, a straw basket, and John's vehicle. The foregoing haphazard manner of Mr. Faherty's bookkeeping in no way is an excuse for Mr. Faherty's failure to report gross receipts of his wife's business, but is included in this memorandum to give the court a complete picture of the manner in which Mr. Faherty performed these tasks.

B. <u>Community and Charitable Civic Activities.</u>

John and Michelle Faherty have devoted themselves to donating their services and time to a variety of charitable activities. Michelle and John Faherty work as a team to help improve their community by dedicating themselves to charitable actions. Over the years, John's involvement has been critical as he acts as the "boots on the ground" to complete the tasks which Michelle undertakes for helping others. The following attest to their efforts to improve their community:

1. Since 2000, John has been devoting his time and effort to a golf tournament established to raise funds for the Jimmy Fund at the Dana Farber Cancer Institute. The tournament initially began in 2000 as a customer appreciation event sponsored by his former employer, Barker Steel Company, with the

3

proceeds donated to the Jimmy Fund/ Dana Farber Cancer Institute. In its second year, the tournament became a memorial golf tournament dedicated to the memory of Joan Brack, wife of the president of Barker Steel Company, and Mr. Faherty served on the board of the Joan H. Brack Foundation.  A letter from the President of the Joan H. Brack Foundation and additional documentation recognizing the contributions of Michelle's company, MRF Associates, are attached (Exhibits 1-1 through 1-4).   Mr. Faherty continues to serve on the Golf Committee for this annual event and solicits donations for a live auction by having monthly meetings with customer vendors.   John is one of five persons on the steering committee for this annual golf tournament which over the years has raised contributions in excess of $1,500,000.

2.  The Fahertys raised over $6500 for the Pan-Massachusetts Challenge in memory of Gail Appel. Attached as Ex. 2-1 is a letter acknowledging the gift. Ms. Appell had been diagnosed with cancer and, after Ms. Appell's passing, the Fahertys took in her dog and cared for him until 2014 when the dog died.  Also attached is a letter from the Town Administrator of Natick, Martha L. White, attesting to John's important contribution to working on this fundraiser to benefit the Dana Farber Cancer Institute, stating that "John was instrumental in organizing this event and ensuring its success, He solicited raffle prizes, secured the location and participated in decision— making down to the smallest of details" (Ex. 2-2). She states that "in no

4

small part to John's participation the event raised over $6000 all of which was donated to the Pan-Mass in support of the work at Dana Farber".

3. Attached are a letter and email both dated April 1, 2012   thanking MRF Associates   for its generous donations of property for an auction which raised funds for the of Parent Teachers Organization of the Consolidated Elementary School (Exs. 3-1 and 3-2). The auction raised funds to pay for various academic enhancements. MRF Associates could not have provided the donations of property without John's hours of work soliciting and collecting the items.

4. Attached is a letter from April 2014 to Michelle Faherty thanking her and her company for contributions of items and time to benefit the Annual Hopedale Commodity Egg Hunt, stating "people like you make it possible for us to continue to provide for family events in our community". (Ex. 4) As noted, Michelle and her husband are partners in life and business. While Michelle is contacted by the organizations, John is the facilitator who helps collect donations. The tasks involved are too time consuming for one person to handle.

5. In December 2007, John organized his brothers, sisters and friends to meet at the Worcester Red Cross office to donate blood as a holiday gift. This has been an annual event although John had to stop personally donating blood in 2011 due to high blood pressure.

6. In 2011, John approached his brothers and sisters on Thanksgiving Day and requested that in lieu of gift-giving for Christmas, the family make a yearly

charitable donation, a custom which is still observed.  Each year the group selects a charity, i.e., in 2011 the charity was My One Wish, in 2012, the Salvation Army, and in both 2013 and 2014, the American Cancer Society.

7. Since 2012, John has participated in an annual golf event to raise funds for Tufts Medical Center for Animals.

8. For the last several years John has solicited sponsors and participated in Cancer Walks and ALS Walks at Milford High School.

9.  John has sponsored for the Scarlet Hawks Golf Tournament to raise funds for the Milford Teachers Association.

In addition to the foregoing, throughout the year Michelle's company receives many samples from manufacturers. The Fahertys take these samples and organize them into donations that are dropped off at various charitable events, schools or other charitable organizations.  Items contributed include baskets, vases, candles, decorative and natural shells, socks, blankets, lunch boxes, toys and craft products and kits. Among the charities and organizations which are the recipients of John and Michelle Faherty's efforts are the Hopedale Church Thrift Shop, the Milford Cat Shelter (goods for yard sales, 3 to 4 times per year, are donated), Hopedale Memorial School (crafts and school type supplies), the Salvation Army, Christmas gifts for families in need (the names of which are obtained from the The Giving Tree at Hopedale Sacred Heart Church), Toys for Tots (drop-off at Christmas time), Milford Food Pantry, Midtown Family Fitness (crafts for the day care center), the Milford Youth Recreational Center, and the Hopedale Library.

C.  Letters Attesting to John's Good Character

1.  Attorney Raymond Mastroianni in his letter dated January 22, 2015 (Ex. 5) writes  of Mr. Faherty's compassionate nature and high moral character, noting the present conduct at bar is an "isolated aberration".

2.  Robert Clement, business owner, who has known John since 1999, writes in his letter dated January 20, 2015 (Ex. 6) of John's high moral character.

3.  Letters of support from John's siblings dated April 5, 2015 (Ex. 7)  and from his mother-in-law, Rita Tocci dated January 22, 2015, (Ex. 8).

III.     APPLICABLE LAW

Courts have discretion in determining sentences according to the provisions of 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, at 259-60(2005).   Section 3553(a) provides as follows:

a) Factors To Be Considered in Imposing a Sentence.   The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider Section 3553 sets forth the factors to be considered by the Court:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)     the need for the sentence imposed -
    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)     to afford adequate deterrence to criminal conduct;
    (C)     to protect the public from further crimes of the defendant; and
    (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3)     the kinds of sentences available;
(4)     the kinds of sentence and the sentencing range established for –
    (A)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .
(5)     any pertinent policy statement . . . issued by the Sentencing Commission.

7

> (6)  the need to avoid unwarranted sentence disparities among        defendants with similar records who have been found guilty of similar conduct; and
>
> (7)  the need to provide restitution to any victims of the offense.

Moreover, <u>Booker</u> invalidated subsection (b) of Section 3553 which made mandatory a guideline sentence unless the court found an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.

In the post-*Booker* case <u>United States v. Gall</u>, 552 U.S. 38 (2007), the Supreme Court is clear that "[w]e reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range". *Id.* at 47 (2007).  While the Guidelines are "the starting point and initial benchmark", *id.* at 49, the sentencing judge must consider all factors put forth by the parties.  "In so doing, he may not presume that the Guidelines range is reasonable….He must make an individualized assessment based on the facts presented." *Id.* at 50.  The overall goal expressed in section 3553(a) is the imposition of a sentence "sufficient but not greater than necessary".

Importantly, as a result of <u>Booker</u> and <u>Gall</u>, a court may not apply a "presumption of unreasonableness" for outside-the-guidelines sentences. *Id.* at 47.

IV.   <u>DISCUSSION</u>

In addition to the Sentencing Guidelines, the other factors to be considered in imposing a sentence in this case under section 3553(a) are as follows:

> (1) <u>The nature and circumstances of the offense and the history and characteristics of the defendant.</u>

As an initial matter, the defendant acknowledges the seriousness of the conduct. The defendant underreported his wife's receipts from her new business resulting in substantial understatements of their tax liabilities for 2007, 2008 and 2009. The defendant has great remorse for his conduct and for the pain he has brought upon his wife and family members. This extremely serious conduct of which he stands convicted is nevertheless an aberration and departure from the exemplary way John has conducted himself throughout his life. Mr. Faherty's life has been replete with instances of helping others and devoting himself not only to his wife and family, but to his community as set forth above. While he failed to honestly report his wife's income, John's history of charitable and civic endeavors and his altruistic nature are significant factors to be taken into account under subsection (a) (1) of the sentencing statute.

As noted above, John has been in sales virtually his entire career. The employees whom he now oversees comprise the same group with whom he has worked for over 20 years. When his former company was sold in 2012, John's division moved as a cohesive group to his present employer, and John was promoted to branch manager this past December to manage the company's new South Boston office, a few hundred yards from this court. John has informed his employer of his conviction, and has been advised that the company would not dismiss him as manager. However, a sentence of incarceration will necessitate the company finding a replacement for John, thereby making it highly likely that his career will be over since his position will have been filled, and the prospect of securing a sales manager position with a new company as a 56 year old saddled with a felony conviction is dim. The Presentence Investigation Report acknowledges this likelihood of John's inability to return to his management position (paragraph 53). As

discussed below, a loss of his career will seriously undermine his ability to make restitution to the Government. Prior to this sentencing hearing, Mr. Faherty has already remitted $50,000 to the IRS to begin this restitution.

In addition, Michelle Flaherty's business, MRF Associates, has suffered a major decline in revenue due to the loss her major customer in 2012. During the years 2012, 2013, and 2014, her net profits declined substantially, with reported net profits for these years in the respective amounts of $222,015, $104,118, and $98,835 (Ex. 9). A loss of John's earning capacity will have a crippling effect on Mr. Faherty's ability to make restitution, as well upon his effort to maintain his career.

(2) The need for the sentence imposed -
    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)    to afford adequate deterrence to criminal conduct;
    (C)    to protect the public from further crimes of the defendant; and
    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

With respect to these objectives, a lengthy sentence of home confinement, with orders to perform community service when not engaged at work, is a substantial restriction of the defendant's freedom. In addition, the defendant would be subject to a lengthy period of probation, further restricting the "prized liberty interest", in the words of the Gall court, supra, of independence of movement and decision-making citizens cherish. The tax code also imposes its own form of punishment, a penalty of 75% of the underreported tax. 26 U.S.C. section 6663. Thus with an underpayment of tax of $100,678, the defendant will be required to pay $75,508.50 on top of the $100,678.

Moreover, interest accrues on both the tax and the fraud penalty, compounded on a daily basis, commencing from the due date of the return for each of the three years. As the defendant stands before the Court, interest continues to accrue having begun on the 2007 tax liability on April 15, 2008, a period of seven years, and then on the 2008 and 2009 liabilities commencing on their respective filing due dates. The defendant will also be required to correct his Massachusetts returns once the IRS has finalized its civil examination report.  Clearly the defendant's actions will have life-long repercussions on his and his wife's financial security. (In addition, these tax obligations can never be discharged in a bankruptcy proceeding due to the exception from discharge for claims based upon fraud.)

To the extent that a sentence without imprisonment might be viewed as an invitation to other taxpayers to cheat on their taxes and hence not serve as a deterrent, U.S. v. Gardellini, 545 F.3d 1089 (D.C.Cir. 2008)  is instructive. There the defendant pled guilty to filing a false return and asked the court for a below-guideline sentence. The guideline sentence was 10-16 months. The district court sentenced the defendant to a fine of $15,000 and five years of probation. The appellate court in reviewing the district court's decision noted that the court had found that the defendant had cooperated with authorities and accepted responsibility for his crime. Second, the court had found that the defendant posed only a minimal risk of recidivism. Third, the court concluded that he had already suffered substantially due to his prosecution noting that he had been treated for depression due to the stress of the investigation. With respect to the deterrence argument the court district had stated that "what really deters tax evaders is 'vigorous enforcement' of the tax laws. *Id.* at 1091. Citing Gall, *supra,* the appellate court reiterated an outside-

the-guideline sentence does not require a showing of extraordinary circumstances.  The court found that "[t]he District Court's conclusion rests on precisely the kind of defendant-specific determinations that are within the special competence of sentencing courts, as the Supreme Court has repeatedly emphasized." *Id*. at 1095. It is noted that the government contended that upholding the sentence would lessen the deterrent value of the criminal law. The court stated "If so, that is the result of Supreme Court precedents such as <u>Gall</u> that we are bound to follow. Moreover, the Government's argument based on deterrence alone is flawed because it elevates one section 3553(a) factor – deterrence-above all others.   As section 3553(a) makes clear, however, the district court at sentencing must consider and balance a number of factors- not all of which will point in the same direction." *Id*. at 1095.

A lengthy period of home confinement, performance of substantial hours of community service, making restitution of tax with substantial civil penalties and interest, subjection to probationary restrictions on freedom all provide punishment and deterrence to criminal conduct.   Given Mr. Faherty's history of being a law –abiding citizen there is no additional sanction necessary for deterrence to criminal conduct.

(3) <u>The kinds of sentences available</u>.

The alternative to home or community confinement is obviously incarceration. As noted above, incarceration will almost certainly lead to a permanent loss of Mr. Faherty's career in management, most likely making the burdens of restitution and payment of civil fines and interest overwhelming. His wife's income, as also noted above, has declined substantially, dropping more than 50% from 2012.   While Mr. Faherty's actions are certainly deserving of punishment, a sentence of incarceration is

likely to jeopardize his career permanently having lifelong ramifications on the Fahertys'
future financial security. A sentence alternative to incarceration is sufficient to penalize
Mr. Faherty and yet still preserve his ability both to make restitution and continue his
contributions to the betterment of his community as he has demonstrated over the past
several years.

(4)  The kinds of sentence and the sentencing range established for –
    (A)    the applicable category of offense committed by the
          applicable category of defendant as set forth in the
          guidelines.
The sentencing range, level 13, provides for a sentence of 12-18 months with at
least half of the time to be incarceration.

(5)  Any pertinent policy statement . . . issued by the Sentencing Commission.

The following is the policy statement on probation and spilt sentences found
at Chapter One, Part A, Subpart 1 of the Sentencing Guidelines Manual:

" (d) Probation and Split Sentences.

The statute provides that the guidelines are to "reflect the general appropriateness of
imposing a sentence other than imprisonment in cases in which the defendant is a first offender
who has not been convicted of a crime of violence or an otherwise serious offense . . . ." 28
U.S.C. § 994(j). Under pre-guidelines sentencing practice, courts sentenced to probation an
inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax
evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's
view are "serious."
The Commission's solution to this problem has been to write guidelines that classify
as serious many offenses for which probation previously was frequently given and provide for at
least a short period of imprisonment in such cases. The Commission concluded that the definite
prospect of prison, even though the term may be short, will serve as a significant deterrent,
particularly when compared with pre-guidelines practice where probation, not prison, was the
norm…."

While this policy statement states that the Sentencing Commission concluded the
"definite prospect of prison, even though the term may be short, will serve as a
significant deterrent", however, it also states that the guidelines are to "reflect the general

13

appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."   Given the substantial adverse economic consequences as outlined above arising from even a short period of incarceration, an alternative sentence of a lengthy home confinement coupled with community service will meet the objective of serving as a significant deterrent while still reflecting the seriousness of the offense and at the same time preserving Mr. Faherty's career. Moreover, such a sentence would fall within the ambit of "reflect[ing] the general appropriateness of imposing a sentence other than imprisonments in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense" as stated in the policy statement.

> (6)   <u>The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.</u>

Since each case requires a fact-specific determination, there will always be disparities among defendants. Cases may be found where sentences for similar offenses will vary greatly.   Judge Timothy S. Hillman in 2014 sentenced a defendant to one year of probation and 100 hours of community service and payment of over $100,000 in restitution, citing the defendant's lack of criminal record and altruism in making his decision. He also noted that the defendant had to live with a felony conviction on the defendant's record. (A copy of the United States Attorney's Office press release is attached as Ex. 10.) We recognize that there are similarly situated defendants who have been sentenced to periods of incarceration for similar offenses. Nevertheless, when looking at the specific facts of this case, a first time offender who will lose his career and

still have to pay over $200,000 for having failed to truthfully pay $108,000 in taxes, a non-guideline sentence satisfies the objectives of section 3553 to be "sufficient, but not greater than necessary, to comply with the provisions set forth in paragraph (2)" (i.e., the factors discussed above).

V.    CONCLUSION

For the foregoing reasons, the facts of this case merits a non-guideline sentence consisting of a lengthy period of home confinement with substantial community service. Such a sentence would be within the purposes of section 3553(a)'s mandate that a sentence be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

**The Defendant**

**JOHN FAHERTY**

By _____

Richard G. Convicer
Convicer & Percy, LLP
2389 Main St.
Glastonbury, CT  06033
Bar No. 678316
Tel:  (860) 657-9040
Fax: (860) 657-9039
Email: rconvicer@convicerpercy.com

15



# Charitable Foundation

June 18, 2014

Dear Friends of the JHB Foundation, the Brack Family and the Construction Industry,

*Dana-Farber Cancer Institute is committed to a single, compelling mission: to give cancer patients the best, most compassionate care today, while finding cures for tomorrow.*

The JHB Charitable Foundation invites you to join with us, the Brack Family to support the Jimmy Fund /Dana-Farber Cancer Institute. Bob's late wife Joan was treated at Dana-Farber with great compassion and care during her battle with cancer. Part of her legacy is the family's commitment to help conquer cancer by supporting the life-saving work of the Dana-Farber Cancer Institute through the Joan H. Brack Memorial Golf Tournament. This tournament is the JBH Charitable Foundation's major philanthropic undertaking. Over the last 14 years the tournament has donated over $1,500,000 to this cause. We would like to continue this giving, with your help. On September 25th, Nancy Rowe, Director of the Jimmy Fund Golf Program, and Mark Avery, Assistant Director will be with us, along with Carri Wood, a member of the LPGA, challenging golfers for a great cause and a good time!

Join a growing list of friends for this yearly event. The 15th Annual JHB Memorial Tournament will take place at Stow Acres Country Club on Thursday, September 25th. Registration and shot gun start at 10:00 AM; complete with a bag lunch, contests, cocktails and dinner. A short program will round out the day with prizes and auction items adding to the festivities.

The enclosed materials describe the various sponsor levels that we offer. As this is one of the biggest Construction related tournaments, please join us and show the industry our commitment to fighting cancer and helping to attain our goal.

On behalf of the JHB Tournament Committee, the Brack Family, Jimmy Fund Golf, Dana-Farber Cancer Institute, and most importantly, thousands of patients, we want to thank you for your ongoing generosity. If you have any questions, please feel free to contact me at 508-377-1104.

Sincerely yours,
**Trustee - JHB Charitable Foundation**

**William H. Brack**

**Robert B. Brack**



The Joan H. Brack Charitable Foundation is a 501(c) (3) organization



# Charitable Foundation

55 Sumner Street
Milford, MA  01757-1679

Robert B. Brack, Trustee
Dr. Virginia C. Brack, Trustee
Kenneth B. Brack, Trustee
William H. Brack, Esq., Trustee

MRF Associates(JF)
Dutcher Street
Hopedale, MA  01747

November 1, 2013

Dear John,

On behalf of the JHB Charitable Foundation and Brack family; Ken, Jinny, Bill and Bob, we would like to thank you for supporting the Fourteenth Annual Joan H. Brack Memorial Golf Tournament through the Joan H. Brack Charitable Foundation.  With your participation we were again able to make a sizable donation to The Jimmy Fund/Dana Farber Cancer Institute.

For the second year in a row, the weather was with us, a perfect day!!  Nancy Rowe, Director of the Jimmy Fund golf Program and Mark Avery form the JF Golf Program, Dr. Ursula Matulonis and Dr. Allison O'Neill; both Oncologists' from the Dana Farber Cancer Institute were present for the festivities.  As has been tradition, Carri Wood, a member of the LPGA was on the 15th hole challenging all golfers to 'Beat the Pro' and helping to raise funds for the Jimmy Fund.

Thank you again for your generous and thoughtful support.  Keep golfing and we look forward to seeing you next September 25th for the Fifteenth Annual!

Sincerely,
The Brack Family

*VCBrack*
Dr. Virginia Brack

*Kenneth B. Brack*
Kenneth B. Brack

*Will Brack*
William H. Brack

*Bob Brack*
Robert B. Brack

June 23, 2014

To whom it may concern:

John Faherty (224 Dutcher Street, Hopedale, Ma 01747) has played a significant role in the Joan Brack Foundation Golf Tournament over the past 10 years. He has been part of the organization team, master of ceremonies of the dinner, and the Auctioneer at the dinner and his role has been significant in the success of the Foundation raising money for the Jimmy Fund over these years. The golf tournament auction alone thanks in a large part to John, raises over $30,000 per year for this worthy cause. John is of outstanding character, is a hard worker and a very conscientious person.

Bob Brack
President of the Joan H Brack Foundation



## The Joan H. Brack Charitable Foundation
### Receipt for Charitable Contribution

Robert B. Brack, co-Trustee of The Joan H. Brack Charitable Foundation, under instrument of trust dated November 25, 1999, hereby acknowledges receipt on November 4, 2013 from MRF Associates(JF) of $1,000.00 as a contribution to said Foundation. Only amounts in excess of the value received are tax deductible.  If you participated in the tournament the value of the benefits received is valued at $75 per participant.

Date: November 4, 2013

*Bob Brack*

Robert B. Brack, Trustee



*The Pan-Massachusetts Challenge*



The
**Jimmy Fund**
DANA-FARBER CANCER INSTITUTE

January 7, 2004

Michelle Faherty & Friends
1st Annual Gail's Gift PMC 2003
224 Dutcher Street
Hopedale, MA 01747

Dear Michelle and Friends of Gail Appel,

Thank you very much for your gift of $6,530.31 in memory of Gail Appel to the Pan-Massachusetts Challenge.

The PMC supports the innovative work of doctors, nurses, and scientists at Dana-Farber Cancer Institute and their search for cures for cancers and related diseases. Your gift is a tribute to Dana-Farber's outstanding work and gives faith to patients, families and friends who seek the most effective and advanced care available today.

The PMC's 2003 goal is to raise $16 million for the Jimmy Fund. We expect our fundraising contribution since 1980 to exceed $100 million – crucial funds that are making a difference in the lives of cancer patients around the world.

Thank you on behalf of all those touched directly by your kindness.

Sincerely,

Billy Starr
Founder and Executive Director
Pan-Massachusetts Challenge

Please retain this letter for your records. As required under current IRS tax code, this is your official receipt certifying that you received neither goods nor services in consideration, in whole or in part, for your gift to Pan-Mass Challenge on behalf of the Jimmy Fund and Dana-Farber Cancer Institute.

Martha L. White
52 Lawrence Street
Milford, MA  01757

October 8, 2014

RE: John Faherty's involvement in charity event

To Whom it May Concern:

My name is Martha White.  I am the Town Administrator for the Town of Natick MA.

I met John Faherty shortly after moving to Milford MA in 1987 through a mutual friend, Gail Appel.  After losing Gail to breast cancer in 2001, a group of her friends decided to do something to honor Gail's memory, celebrate her life and aid the fight against breast cancer.  In recognition of Gail's support of and 5-time participation in the Pan-Mass Challenge (a 2-day, 198-mile bicycle ride in support of the Dana Farber Cancer Institute), we decided to hold a fundraiser for this cause.

John was instrumental in organizing this event and ensuring its success. He solicited raffle prizes, secured the location, and participated in decision-making down to the smallest of details.  John also ably served as master of ceremonies at the event.  Thanks in no small part to John's participation the event raised over $6,000, all of which was donated to the Pan-Mass in support of the work at Dana Farber.

My observation of John during this time was that he is a kind-hearted and generous man, and it is my understanding that he has been involved in several other charitable events.

Sincerely,

Martha L. White

# CONSOLIDATED PTO

Consolidated Elementary School   12 Gillotti Road   New Fairfield, Connecticut  06812
501 (c)(3) Tax Exempt Number 06-1555025

April 1st, 2012

MRF Associates
224 Dutcher Street
Hopedale, MA  01747

Dear Michelle:

Thank you for your generous donation to the PTO for Consolidated School, a Connecticut-based nonprofit organization recognized under section 501(c)(3) of the IRS tax code.  Your donations were auctioned off at our 22nd Annual Silent Auction & Cocktail Reception which was held on March 30th, 2012 here in New Fairfield, Connecticut.

This event helped raise funds to further the PTO's tax-exempt activities.  This year, we have designated the auction funds to pay for various academic enhancements including new technology for classrooms, special programs which supplement the daily curriculum and events such as author and illustrator visits, among other things.  For your records, please note that the Consolidated School PTO's tax ID number is 06-1555025.

**On behalf of all the students of Consolidated School, thank you for your support!**

Sincerely,

Sue Mitchell
Auction Co-Chairperson
Consolidated School PTO

Kathy Donahue
Auction Co-Chairperson
Consolidated School PTO

**michelle faherty**

| | |
|---|---|
| **From:** | Kathy Donahue [kathychan@charter.net] |
| **Sent:** | Sunday, April 01, 2012 10:00 PM |
| **To:** | michelle faherty |
| **Subject:** | Post Auction Update |
| **Attachments:** | 2012 Auction Donation Thank you Letter.doc |

Hi Michelle,

I thought I would check in with you to let you know that we had a very successful auction on Friday night! Your stuff was great and we were able to make up so many different baskets, etc. So thank you again. We raised $25,000 for the school, our best record yet!

In an effort to save the school money & to save trees, I am emailing thank you letters when I can. I have attached it for your reference.

Thank you again. Your donation really helped us out!

Kathy

Dear Michelle,

Thank you, and MRF,
for your generous donation of
toys and assorted prizes used at
The First Annual Hopedale Community Egg
Hunt. We would also like to thank
you personally for donating your
time. We couldn't have done it with-
out your help putting out eggs + running
the prize table.

$\longrightarrow$

# THANK YOU

People like you make it possible for us to continue to provide fon, family events in our community.

Once again, thank you for your generous donation.

Sincerely,

Kristen Thomore
& Mike Patton



Raymond M. Mastroianni
5 Karen Lane
Milford, MA 01757

January 22, 2015

RE: John Faherty

To whom it may concern:

I have been fortunate to have known John Faherty for approximately 20 years. I have both
socialized and done business with him and feel confident I know his personality and character
well. His kindness, integrity, undying optimism and compassionate nature have always
impressed me. He has always handled himself with class, dignity and displayed a strong moral
fiber.

Professionally, he is dedicated, diligent and efficient. I have seen him answer phone calls and
respond to emails while on vacation, late at night and on weekends. In short, he is a man who
can be trusted, not to simply do his work, but to do it to the best of his ability. It would appear
that he is a model employee who truly values his job, his colleagues and his profession.
Personally, in my professional dealings with John, I have always been treated with courtesy,
fairness and respect.

An Irishman to the core, John lights up a room with his infectious smile and gregarious
personality. To him, there are no strangers as people seem to be drawn to him immediately. Of
course John derives the most pleasure and satisfaction from his relationship with his friends and
family. His relationship with his wife is one to be envied and you can sense an unwavering bond
when you are in their presence. Throughout this difficult process they have become closer, if
that is possible. This is enviable and demonstrative of his innate goodness and the measure of
John as a person.

I have also seen him with his numerous nieces and nephews during the holiday season and at
other social events. Whether spoiling them with gifts, playing with them or providing advice, it
is obvious that this is not a chore to him. Contrarily, it is from his heart and it is clear how
important family is to John. He will always console friends in distress with an empathetic smile,
caring hug or a few sympathetic words. It is frequently said that one can learn about a man's true
character by playing a round of golf with them. I have been on several golf trips with him and
can state that, not only does John know the rules of golf, but adheres to them religiously. This
cannot be said about all of us on these outings.

Honestly, I am not familiar with the full details of what has transpired to place John in this
predicament and have only a cursory understanding of the facts. However, as an officer of the
court it is my hope that the ultimate punishment is not excessively punitive or draconian. He
understands that there are always repercussions to our actions and is sincerely apologetic and
remorseful. He deeply regrets the inconvenience he has caused the judicial system, the expense
he has caused the taxpayers and how this may reflect on him personally and professionally.

Mostly, he is inconsolable about the stress and anxiety he has placed upon his wife, the most important person in his life.  Today, he feels compunction and is willing to accept the consequences resulting from his actions.

It is my sincere desire that the resolution allows John to resume being the reliable friend, responsible employee and caring husband that he is.  With full confidence,  I can state that this situation is an isolated aberration and not something that will ever be repeated.  His uneasiness over this is palpable and the people closest to him are hopeful that he regains his joyfulness for life once this is resolved.

Whatever the eventual outcome, John will always have the love and support of his friends, business associates and family.  He will never be judged, ridiculed or questioned.  Ultimately, this is the most comprehensible indication of a man's true character and unambiguous indication of their integrity.

Respectfully Yours,

Raymond M. Mastroianni

Robert Clemente

13 Mill Pond Circle

Milford, MA 01757

January 20, 2015


RE: Mr. John Faherty

224 Dutcher Street

Hopedale, MA 01747


To Whom It May Concern;

Please accept this letter as a reference for John Faherty.

I met John in the fall of 1999 when my wife and I acquired a health and racquetball club in Milford, MA.  Over the past 15 years I have gotten to know John not only as a club member but as a friend as well.  His involvement in many club sponsored racquetball tournaments afforded me the opportunity to see him be competitive, social, a team leader and a mentor to those in need of help.  In all cases, John was humble and gracious.  His racquetball peers always had a high level of respect not only for his ability but for his character as well.

During this same period, I have spent time with John at a variety of area social events.  Be it at a local fundraiser, a neighborhood get together or a political event John's actions, behavior and character were in my opinion consistently "Rock Solid".

I am proud to have known John and look forward to many more years of being in his company as not only a club member but as a friend as well.


Regards,

Bob Clemente

EXH 7

April 5, 2015

This letter is written in support of John Faherty by his siblings to provide the Court with a more fully rounded picture of our brother.  As family members who have known John longer and better than any others it is our intention to reveal his true character and values as we know them.

Over the course of our lives together, we have found that John is always willing to assist a friend, colleague or family member and does everything in his power to see that they get what they need.  No matter who asks for help, John is there to lend a helping hand.  He was the oldest sibling living at home when our mother became chronically ill and was in and out of the hospital for a ten year period before she died.  During the same timeframe our father struggled with alcoholism and was in and out of rehab for extended stays.  Unlike the older siblings in our family who were out of the home, many familial responsibilities fell on John's shoulders at a young age including care for the younger siblings and our mother.  After our mother's passing, when our father needed a place to live, John readily invited him to move into his apartment until our father could sort out his own living situation.

We also know that John is an exceedingly hard worker with a strong work ethic.  He has worked steadily since his teens in many different capacities as a reliable and dedicated employee.  As testimony to this fact, he was recently tasked with the opening of a new office for his company.  Despite having to tell his employers about the current situation he faces with the IRS, they continue to have faith in his trustworthiness and have promised to work with him throughout this difficult period.

In our estimation John is also a generous and compassionate person.  Over the years he has participated in many charity events, donated time and money to numerous organizations and provided assistance in the support of individuals and/or the community as is well-documented in Michelle Faherty's letter.

Since the initial audit by the IRS John has complied with all inquiries/requests so that his case could be settled expeditiously.  Throughout the IRS review of his records (over 3+ years), John has continued to work diligently to pay back taxes.

John is a law-abiding citizen and is working to put his life back in order.  The stress of the past 3+ years, the humiliation of having to reveal this situation to his family, friends, in-laws and employer has been very traumatic.  He is currently undergoing therapy and

now requires medication to manage the stress of it all.   Despite this set-back, however, he has taken full responsibility for his actions and has learned a valuable lesson.

John has the complete support and backing of his family, many friends and employer.  He has made every effort to get back on track and correct past transgressions.  We urge the Court to give full consideration to this account of what *we know* to our brother's true character and values.

With our sincere appreciation,


Elizabeth Faherty

Sharon Faherty

David Faherty

Patricia White

Kenneth Faherty

EXH σ

Jan. 22, 2015

Dear Sir or Madom

I have known John Faherty for 20 years. John is my son in law, married to my daughter Michelle.

John's moral character is upstanding, he is honest and possesses a strong sense of integrity. I believe that John is honest to the core.

If a mistake was made John will do whatever it takes to make reparations financially and emotionally. I hope John will be given an opportunity to have a second chance to right any wrong he has done.

John is a wonderful man who is always ready to help family in any way he can. John calls me Mom and I proudly call him Son

Thank you in advance for your fair decision.

R. t. m. Ferri

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

# Profit or Loss From Business
(Sole Proprietorship)

► For information on Schedule C and its instructions, go to www.irs.gov/schedulec.
► Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065.

OMB No. 1545-0074

**2012**

Attachment
Sequence No. **09**

| Name of proprietor | Social security number (SSN) |
|---|---|
| MICHELLE R FAHERTY | |

| A | Principal business or profession, including product or service (see instructions) | B | Enter code from instructions |
|---|---|---|---|
| | MANUFACTURER'S REPRESENTATIVE | | ► 541990 |

| C | Business name. If no separate business name, leave blank. | D | Employer ID number (EIN), (see instr.) |
|---|---|---|---|
| | MRF ASSOCIATES | | |

| E | Business address (including suite or room no.) ► 224 DUTCHER STREET | | |
|---|---|---|---|
| | City, town or post office, state, and ZIP code   HOPEDALE   MA   01747 | | |

F  Accounting method:   (1) [X] Cash   (2) [ ] Accrual   (3) [ ] Other (specify) ►

G  Did you "materially participate" in the operation of this business during 2012? If "No," see instructions for limit on losses . . . . [X] Yes [ ] No

H  If you started or acquired this business during 2012, check here . . . . . . . . . . . . . . . . . ►[ ]

I  Did you make any payments in 2012 that would require you to file Form(s) 1099? (see instructions) . . . . . [X] Yes [ ] No

J  If "Yes," did you or will you file required Forms 1099? . . . . . . . . . . . . . . . . [X] Yes [ ] No

## Part I  Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked . . . . . . . . . . ►[ ] | 1 | 294,577 |
| 2 | Returns and allowances (see instructions) . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . . . . . | 3 | 294,577 |
| 4 | Cost of goods sold (from line 42) . . . . . . . . . . . . . . . . . . . | 4 | 15,414 |
| 5 | Gross profit. Subtract line 4 from line 3 . . . . . . . . . . . . . . . . . | 5 | 279,163 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) . . . | 6 | |
| 7 | Gross income. Add lines 5 and 6 . . . . . . . . . . . . . . . . . . . ► | 7 | 279,163 |

## Part II  Expenses    Enter expenses for business use of your home only on line 30.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Advertising . . . . . . | 8 | | 18 | Office expense (see instructions) . | 18 | |
| 9 | Car and truck expenses (see instructions) . . . . . | 9 | 13,807 | 19 | Pension and profit-sharing plans | 19 | |
| | | | | 20 | Rent or lease (see instructions): | | |
| 10 | Commissions and fees . . | 10 | | a | Vehicles, machinery, and equipment . | 20a | |
| 11 | Contract labor (see instructions) | 11 | 7,076 | b | Other business property . . . | 20b | |
| 12 | Depletion . . . . . | 12 | | 21 | Repairs and maintenance . . | 21 | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) . . . . | 13 | 2,076 | 22 | Supplies (not included in Part III) . | 22 | 952 |
| | | | | 23 | Taxes and licenses . . . . | 23 | 511 |
| | | | | 24 | Travel, meals, and entertainment: | | |
| 14 | Employee benefit programs (other than on line 19). . . | 14 | | a | Travel . . . . . . | 24a | 7,863 |
| 15 | Insurance (other than health) . | 15 | | b | Deductible meals and entertainment (see instructions) | 24b | 2,486 |
| 16 | Interest: | | | 25 | Utilities . . . . . . | 25 | |
| a | Mortgage (paid to banks, etc.) | 16a | | 26 | Wages (less employment credits) . | 26 | |
| b | Other . . . . . . | 16b | | 27a | Other expenses (from line 48) . | 27a | 10,819 |
| 17 | Legal and professional services . | 17 | 5,720 | b | Reserved for future use . . . | 27b | |

| | | | |
|---|---|---|---|
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27a . . . . . . . ► | 28 | 51,310 |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 . . . . . . . . . . . . . . . | 29 | 227,853 |
| 30 | Expenses for business use of your home. Attach Form 8829. Do not report such expenses elsewhere . . | 30 | 5,838 |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | 31 | 222,015 |

31 ... Net profit or (loss). Subtract line 30 from line 29.
  • If a profit, enter on both Form 1040, line 12 (or Form 1040NR, line 13) and on Schedule SE, line 2.
  (If you checked the box on line 1, see instructions) Estates and trusts, enter on Form 1041, line 3.
  • If a loss, you must go to line 32.

32  If you have a loss, check the box that describes your investment in this activity (see instructions).
  • If you checked 32a, enter the loss on both Form 1040, line 12, (or Form 1040NR, line 13) and on Schedule SE, line 2. (If you checked the box on line 1, see the line 31 instructions.) Estates and trusts, enter on Form 1041, line 3.
  • If you checked 32b, you must attach Form 6198. Your loss may be limited.

32a [ ] All investment is at risk.
32b [ ] Some investment is not at risk.

For Paperwork Reduction Act Notice, see your tax return instructions.

Schedule C (Form 1040) 2012

HTA

# SCHEDULE C
## (Form 1040)

Department of the Treasury
Internal Revenue Service (99)

# Profit or Loss From Business
### (Sole Proprietorship)

► Information about Schedule C and its separate Instructions is at *www.irs.gov/schedulec*.
► Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065.

OMB No. 1545-0074

**2014**

Attachment
Sequence No. **09**

| | | |
|---|---|---|
| Name of proprietor | | Social security number (SSN) |
| MICHELLE R FAHERTY | | |

**A** Principal business or profession, including product or service (see instructions)
MANUFACTURER'S REPRESENTATIVE

**B** Enter code from instructions ► 541990

**C** Business name. If no separate business name, leave blank.
MRF ASSOCIATES

**D** Employer ID number (EIN), (see instr.)

**E** Business address (including suite or room no.) ► 224 DUTCHER STREET
City, town or post office, state, and ZIP code   HOPEDALE   MA   01747

**F** Accounting method: (1) [X] Cash   (2) [ ] Accrual   (3) [ ] Other (specify) ►

**G** Did you "materially participate" in the operation of this business during 2014? If "No," see instructions for limit on losses . . . [X] Yes [ ] No

**H** If you started or acquired this business during 2014, check here . . . . . . . . . ►

**I** Did you make any payments in 2014 that would require you to file Form(s) 1099? (see instructions) . . [X] Yes [ ] No

**J** If "Yes," did you or will you file required Forms 1099? . . . . . . . . . . . . . . . [X] Yes [ ] No

## Part I   Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked . . . . . . . ► [ ] | 1 | 151,117 |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 151,117 |
| 4 | Cost of goods sold (from line 42) | 4 | 11,523 |
| 5 | Gross profit. Subtract line 4 from line 3 | 5 | 139,594 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) | 6 | |
| 7 | Gross income. Add lines 5 and 6 . . . . . . . . . . . . . . . . . . . ► | 7 | 139,594 |

## Part II   Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Advertising . . . . . | 8 | | 18 Office expense (see instructions) . | 18 | |
| 9 | Car and truck expenses (see instructions) . . . . | 9 | 14,398 | 19 Pension and profit-sharing plans | 19 | |
| | | | | 20 Rent or lease (see instructions): | | |
| 10 | Commissions and fees . . | 10 | | a Vehicles, machinery, and equipment . | 20a | |
| 11 | Contract labor (see instructions) | 11 | | b Other business property . . . | 20b | |
| 12 | Depletion . . . . | 12 | | 21 Repairs and maintenance . . | 21 | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) | 13 | | 22 Supplies (not included in Part III) . | 22 | 991 |
| | | | | 23 Taxes and licenses . . . | 23 | |
| 14 | Employee benefit programs (other than on line 19). | 14 | | 24 Travel, meals, and entertainment: | | |
| | | | | a Travel . . . . . . | 24a | 7,173 |
| 15 | Insurance (other than health) . | 15 | | b Deductible meals and entertainment (see instructions) | 24b | 1,503 |
| 16 | Interest: | | | 25 Utilities . . . . . | 25 | |
| a | Mortgage (paid to banks, etc.) | 16a | | 26 Wages (less employment credits) . | 26 | |
| b | Other . . . . . . | 16b | | 27a Other expenses (from line 48) . | 27a | 11,792 |
| 17 | Legal and professional services | 17 | 425 | 27b Reserved for future use . . | 27b | |
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27a . . . . ► | | | | 28 | 36,280 |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 . . . . . . . . . . . . . | | | | 29 | 103,314 |
| 30 | Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method (see instructions). Simplified method filers only: enter the total square footage of: (a) your home: _____ and (b) the part of your home used for business: _____ . Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30 . . . . . . . . | | | | 30 | 4,479 |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | | | 31 | 98,835 |
| | • If a profit, enter on both Form 1040, line 12 (or Form 1040NR, line 13) and on Schedule SE, line 2. (If you checked the box on line 1, see instructions) Estates and trusts, enter on Form 1041, line 3. | | | | | |
| | • If a loss, you must go to line 32. | | | | | |
| 32 | If you have a loss, check the box that describes your investment in this activity (see instructions). | | | | | |
| | • If you checked 32a, enter the loss on both Form 1040, line 12, (or Form 1040NR, line 13) and on Schedule SE, line 2. (If you checked the box on line 1, see the line 31 instructions.) Estates and trusts, enter on Form 1041, line 3. | | | 32a [ ] All investment is at risk. | | |
| | • If you checked 32b, you must attach Form 6198. Your loss may be limited. | | | 32b [ ] Some investment is not at risk. | | |

For Paperwork Reduction Act Notice, see the separate instructions.

HTA

Schedule C (Form 1040) 2014

# Profit or Loss From Business
### (Sole Proprietorship)

SCHEDULE C
(Form 1040)

Department of the Treasury
Internal Revenue Service (99)

OMB No. 1545-0074

20**14**

Attachment
Sequence No. **09**

▶ Information about Schedule C and its separate instructions is at *www.irs.gov/schedulec.*
▶ Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065.

Name of proprietor
**MICHELLE R FAHERTY**

Social security number (SSN)

**A**  Principal business or profession, including product or service (see instructions)
**MANUFACTURER'S REPRESENTATIVE**

**B**  Enter code from instructions
▶    541990

**C**  Business name. If no separate business name, leave blank.
**MRF ASSOCIATES**

**D**  Employer ID number (EIN), (see instr.)

**E**  Business address (including suite or room no.) ▶  **224 DUTCHER STREET**
City, town or post office, state, and ZIP code   **HOPEDALE**               MA      01747

**F**  Accounting method:   (1) [X] Cash   (2) [ ] Accrual   (3) [ ] Other (specify) ▶

**G**  Did you "materially participate" in the operation of this business during 2014? If "No," see instructions for limit on losses   [X] Yes  [ ] No

**H**  If you started or acquired this business during 2014, check here   ▶ [ ]

**I**  Did you make any payments in 2014 that would require you to file Form(s) 1099? (see instructions)   [X] Yes  [ ] No

**J**  If "Yes," did you or will you file required Forms 1099?   [X] Yes  [ ] No

## Part I   Income

| | | | |
|---|---|---:|---:|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked ▶ [ ] | 1 | 151,117 |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 151,117 |
| 4 | Cost of goods sold (from line 42) | 4 | 11,523 |
| 5 | Gross profit. Subtract line 4 from line 3 | 5 | 139,594 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) | 6 | |
| 7 | Gross income. Add lines 5 and 6 ▶ | 7 | 139,594 |

## Part II   Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | | | |
|---|---|---:|---|---|---|---|---:|
| 8 | Advertising | 8 | | 18 | Office expense (see instructions) | 18 | |
| 9 | Car and truck expenses (see instructions) | 9 | 14,396 | 19 | Pension and profit-sharing plans | 19 | |
| 10 | Commissions and fees | 10 | | 20 | Rent or lease (see instructions): | | |
| 11 | Contract labor (see instructions) | 11 | | a | Vehicles, machinery, and equipment | 20a | |
| 12 | Depletion | 12 | | b | Other business property | 20b | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) | 13 | | 21 | Repairs and maintenance | 21 | |
| | | | | 22 | Supplies (not included in Part III) | 22 | 991 |
| | | | | 23 | Taxes and licenses | 23 | |
| 14 | Employee benefit programs (other than on line 19). | 14 | | 24 | Travel, meals, and entertainment: | | |
| | | | | a | Travel | 24a | 7,173 |
| 15 | Insurance (other than health) | 15 | | b | Deductible meals and entertainment (see instructions) | 24b | 1,503 |
| 16 | Interest: | | | 25 | Utilities | 25 | |
| a | Mortgage (paid to banks, etc.) | 16a | | 26 | Wages (less employment credits) | 26 | |
| b | Other | 16b | | 27a | Other expenses (from line 48) | 27a | 11,792 |
| 17 | Legal and professional services | 17 | 425 | b | Reserved for future use ▶ | 27b | |

| | | | |
|---|---|---:|---:|
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27a ▶ | 28 | 36,280 |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 | 29 | 103,314 |
| 30 | Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method (see instructions). Simplified method filers only: enter the total square footage of: (a) your home: _____ and (b) the part of your home used for business: _____. Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30. | 30 | 4,479 |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | 31 | 98,835 |

• If a profit, enter on both Form 1040, line 12 (or Form 1040NR, line 13) and on Schedule SE, line 2.
(If you checked the box on line 1, see instructions.) Estates and trusts, enter on Form 1041, line 3.
• If a loss, you must go to line 32.

**32**  If you have a loss, check the box that describes your investment in this activity (see instructions).
• If you checked 32a, enter the loss on both Form 1040, line 12, (or Form 1040NR, line 13) and on Schedule SE, line 2. (If you checked the box on line 1, see the line 31 instructions.) Estates and trusts, enter on Form 1041, line 3.
• If you checked 32b, you must attach Form 6198. Your loss may be limited.

32a [ ] All investment is at risk.
32b [ ] Some investment is not at risk.

For Paperwork Reduction Act Notice, see the separate instructions.

HTA

Schedule C (Form 1040) 2014

EXH 10


United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

DISTRICT *of* MASSACHUSETTS

U.S. Attorneys » District of Massachusetts » News

### Department of Justice

### U.S. Attorney's Office

### District of Massachusetts

FOR IMMEDIATE RELEASE                    Wednesday, April 30, 2014

# Shrewsbury Woman Sentenced For Filing False Tax Returns

BOSTON – A Shrewsbury woman was sentenced today in U.S. District Court in Worcester for underreporting income on her federal tax returns.

Roberta I. Crudale Blute, 56, was sentenced by U.S. District Court Judge Timothy S. Hillman to one year probation and 100 hours of community service. Judge Hillman further ordered her to pay $114,576 in restitution to the IRS and to cooperate with the IRS to file amended tax returns and pay the taxes owed. In January 2014, Blute pleaded guilty to filing false federal tax returns for tax years 2007 and 2008.

Blute omitted from her tax returns hundreds of thousands of dollars in income she earned from numerous employers in 2007 and 2008. Specifically, she failed to report income she earned from four companies in 2007 and five companies in 2008.

United States Attorney Carmen M. Ortiz; William P. Offord, Special Agent in Charge of the Internal Revenue Service's Criminal Investigation in Boston; Vincent B. Lisi, Special Agent in Charge of the Federal Bureau of Investigation, Boston Field Division; and Phillip M. Coyne, Special Agent in Charge of the Department of Health and Human Services, Office of Inspector General, Office of Investigations, made the announcement today. The case was prosecuted by Amanda P.M. Strachan and Miranda Hooker of Ortiz's Health Care Fraud Unit.

USAO - District of Massachusetts
Updated December 15, 2014

**C E R T I F I C A T I O N**

I hereby certify that on  April 8, 2015, a copy of the foregoing Defendant's Memorandum In Aid of Sentencing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system and to the assigned  Probation  Officer.  Parties  may  access  this  filing  through  the  court's  filing through the court's CM/ECF System.

Richard G. Convicer
Convicer & Percy, LLP
2389 Main St.
Glastonbury, CT  06033
Bar No. 678316
Tel:  (860) 657-9040
Fax: (860) 657-9039
Email: rconvicer@convicerpercy.com

16